## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

NATHAN PRAWITT, derivatively on   )
behalf of INTRUSION, INC.,   )
   )
      Plaintiff,   )
   )   Civil Action No. _____
   )
     v.   )
   )   JURY TRIAL DEMANDED
JACK B. BLOUNT, MICHAEL L.   )
PAXTON, B. FRANKLIN BYRD, P. JOE   )
HEAD, GARY DAVIS, JAMES F. GERO,   )
ANTHONY SCOTT, ANTHONY J.   )
LEVECCHIO, KATRINKA B.   )
MCCALLUM, JAMIE M. SCHNUR,   )
GREORY K. WILSON,   )
   )
      Defendants,   )
   )
    -and-   )
   )
INTRUSION, INC.,   )
   )
      Nominal Defendant.   )

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Nathan Prawitt ("Plaintiff"), by and through his undersigned counsel, alleges the following based upon personal knowledge as to matters concerning himself, and upon information and belief as to all other matters based on, *inter alia*, the investigation of counsel, which includes review and analyses of: (a) the filings of Intrusion, Inc. ("Intrusion" or "the Company") with the United States Securities and Exchange Commission (the "SEC"), (b) news articles, press releases, conference call transcripts, analysts' reports, and other publicly available information concerning the Company, and (c) the pleadings, Orders and filings in the consolidated securities class action litigation *Celeste v. Intrusion, Inc. et al.*, Civil Action No. 4:21-cv-00307-SDJ (E.D. Tex.) (the

"Securities Action"), presently pending in the United States District Court for the Eastern District of Texas (the "Securities Action Court").

## NATURE OF THE ACTION

1.      This stockholder derivative action is brought on behalf of Intrusion against certain members of the Company's Board of Directors (the "Board") and Company Officers for breach of their fiduciary duties in issuing, causing to be issued, or permitting the issuance of materially false and misleading public statements concerning the Company's computer network product, the Intrusion Shield ("Shield"), as well as for waste of corporate assets and unjust enrichment, during the period October 14, 2020 and August 26, 2021 (the "Relevant Period").

2.      Shield was touted as a proprietary artificial intelligence ("AI") technology that could detect, analyze, identify and counter cyberattacks without human intervention. Shield, however, was merely a re-branded recycling of Intrusion's Savant and TraceCop products that lacked the AI capabilities claimed by Defendants. In marketing Shield, Defendants issued or caused to be issued, materially false and misleading statements concerning, *inter alia*, the parameters and purported success of product testing, and the number and identity of customers who purportedly purchased Shield.  In fact, Shield was not only non-functional, its implementation adversely affected customers' networks, sometimes shutting them down entirely.

3.      In April 2021, while Defendants were assuring the market that the introduction of Shield was proceeding as planned, White Diamond Research ("White Diamond") issued a report publicizing some of the problems with the Shield and other issues concerning the Company.  While Intrusion publicly refuted the White Diamond report, the truth regarding Shield was disclosed when Intrusion failed to rollout 50,000 product seats and, therefore, failed to meet revenue

expectations from those sales. Thereafter, Intrusion laid off approximately 20% of its workers and it was subsequently disclosed that SEC had commenced an investigation of the Company.

4.      On April 16, 2021, a securities class action, *Celeste v. Intrusion, Inc. et al.*, Case No. 4:21-cv-00307 (E.D. Tex.), was filed in the United States District Court for the Eastern District of Texas, for violations of the Securities Exchange Act of 1934 (the "Exchange Act").  On May 14, 2021, a second securities class action, *Neely v. Intrusion, Inc. et al.*, was filed in the United States District Court for the Eastern District of Texas, also alleging violations of the Exchange Act.  On November 23, 2021, the securities class actions were consolidated (the "Securities Action") and, on February 7, 2022, an amended complaint was filed in the Securities Action (the "Securities Complaint").  On April 13, 2022, the Securities Action was stayed to permit the parties to file a motion for preliminary approval of class action settlement.

5.      Defendants have damaged Intrusion by causing the Company to waste corporate assets by: (i) incurring costs and expenses in connection with the SEC investigation, (ii) incurring costs and expenses to defend itself in the Securities Action, and (iii) settling class-wide liability in the Securities Action. In addition, certain of the Individual Defendants (defined below) were unjustly enriched by selling shares of Company stock in a follow-on offering conducted while the price of that stock was artificially inflated by Defendants' materially false and misleading statements. Intrusion has also sustained reputational harm, which will result in lost business opportunities, as direct result of Defendants' breach of fiduciary duties.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Exchange Act over the claims asserted herein for violations of sections 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

7.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

8.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

9.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because Nominal Defendant Intrusion is incorporated in this District and conducts business in this District.

## PARTIES

*Plaintiff*

11.     Plaintiff is, and has been at all relevant times, a continuous shareholder of Intrusion.

*Nominal Defendant*

12.     Nominal Defendant Intrusion is incorporated under the laws of Delaware with its principal executive offices located in Plano, Texas. Intrusion's common stock trades on the NasdaqCM exchange under the symbol "INTZ."

*Individual Defendants*

13.     Defendant Jack B. Blount ("Blount") was the Company's Chief Executive Officer ("CEO"), President and Chairman of the Board from the start of the Relevant Period (October 14, 2020, and August 26, 2021) until he was terminated by the Company in July 2021.

14.     Defendant Michael L. Paxton ("Michael Paxton") was the Company's Chief Financial Officer ("CFO"), Treasurer, and Secretary from August 2002 to December 31, 2020.

Paxton was also a member of the Company's Board of Directors from 2019 until December 31, 2020, and Chairman of the Board from November 2019 to August 2020. He also previously served as interim President & CEO from November 2019 to May 2020. Defendant Paxton is the son of deceased Intrusion co-founder G. Ward Paxton, Jr.  Paxton sold approximately 324,432 shares of Intrusion common stock in an October 2020 follow-on public offering conducted by the Company. In addition, members of Paxton's family sold approximately 675,558 shares in that offering.

15.     Defendant B. Franklin Byrd ("Byrd") was the Company's Chief Financial Officer ("CFO") from December 2020 through the end of the Relevant Period.

16.     Defendant P. Joe Head ("Head") was the Company's co-founder and Chief Information Officer ("CIO") throughout the Relevant Period. Head sold approximately 100,000 shares of Intrusion common stock in an October 2020 follow-on public offering conducted by the Company.

17.     Defendant Gary Davis ("Davis") was the Company's Chief Marketing Officer ("CMO") from February 22, 2021, through the end of the Relevant Period.

18.     Defendant James Gero ("Gero") was a purportedly independent Director of Intrusion during the Relevant Period, and a director since October 27, 2003.  Gero serves as the Chair of Intrusion's Compensation Committee and its Nominating and Governance Committees.

19.     Defendant Anthony Scott ("Scott") has been the Company's President and CEO since November 11, 2021, and a director of Intrusion since January 21, 2022.

20.     Defendant Anthony J. LeVecchio ("LeVecchio") has been a director of the Company since August 6, 2020, Board Chair since August 20, 2020, and was appointed to serve as Intrusion's "Executive Chairman of the Board" on August 4, 2021. LeVecchio also serves on the Company's Compensation Committee.

5

21.     Defendant Katrinka B. McCallum ("McCallum") has been a director of the Company since February 2021 and serves as Chair of Intrusion's Audit Committee and as a member of its Nominating and Corporate Governance Committee.

22.     Defendant Jamie M. Schnur ("Schnur") has been a director of the Company since May 2021 and serves on Intrusion's Audit and Compensation Committees.

23.     Defendant Gregory K. Wilson ("Wilson") has been a director of the Company since May 2021 and serves on Intrusion's Audit, Nominating and Corporate Governance Committees.

24.     The Defendants referenced in paragraphs 13 through 23 are referred to herein as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

25.     By reason of their positions as officers and/or directors of Intrusion, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Intrusion and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Intrusion and its shareholders so as to benefit all shareholders equally.

26.     Each director and officer of the Company owes to Intrusion and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

27.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Intrusion, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein and/or failed to take any action to recoup the Company assets wasted in connection with the SEC investigation and the Securities Action.

28.     To discharge their duties, the officers and directors of View were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

29.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed the Company and its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Intrusion, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

30.     As senior executive officer and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NasdaqCM exchange, the Individual Defendants had a fiduciary duty to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and materially misleading information regarding the Company's business, prospects, and operations.   The Individual Defendants also had a fiduciary duty to disclose the material information necessary to prevent other public statements, including those in its regulatory filings with the SEC, from being materially false and, so that the market price of the Company's common stock was based upon truthful, accurate, and fairly presented information.

31.     To discharge their duties, the officers and directors of Intrusion were required to

exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Intrusion's own Code of Conduct For Employees, Executive Officers, and Directors (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Intrusion conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Intrusion and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Intrusion's operations would comply with all applicable laws and the Company's public statements, financial statements and regulatory filings were accurate;

(f)     adequately monitor the Company's officers and employees to ensure that

their public statements about the Company were complete and accurate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

32.    Each of the Individual Defendants further owed Intrusion and its shareholders the duty of loyalty requiring that they favor the interest of the Company and its shareholders over their own while conducting the affairs of Intrusion, and that the Individual Defendants refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

33.    At all times relevant hereto, the Individual Defendants were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

34.    Because of their advisory, executive, managerial, and directorial positions with Intrusion, each of the Individual Defendants had access to adverse, non-public information about the Company.

35.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

**INTRUSION'S CODE OF CONDUCT**

36.    Intrusion's Code of Conduct states that "[i]t summarizes, clarifies and documents the principles that should guide all Company 'Employees' and 'Executive Officers' (collectively,

'Company Personnel') as well as its 'Non Employee Directors' (collectively with Company Personnel, 'Company Agents')."   The Code of Conduct provides that "VIOLATION OF THIS CODE WILL SUBJECT COMPANY AGENTS TO DISCIPLINARY ACTION, UP TO AND INCLUDING, TERMINATION."

37.     The Code of Conduct provides, in pertinent part, that:

**Honesty and Fairness**

The Company engages in many and varied business relationships with individuals, organizations, businesses, governmental and regulatory agencies ("Company Contacts"), and Company Agents are often called upon to represent the Company in dealings with these Company Contacts.  No Company Agent should ever make misrepresentations or dishonest statements, or statements intended to mislead, misrepresent or misinform any Company Contact and should promptly correct or clarify any written or verbal statement that has been, or which may be, misunderstood by a Company Contact.

**Compliance with Applicable Law**

The Company is committed to strict compliance with all applicable governmental laws, rules and regulations, including but not limited to laws, rules and regulations related to securities, labor, employment and workplace safety matters ("Applicable Laws").  All Company Agents are expected to comply with all Applicable Laws, and any violation of such should be immediately reported to the appropriate Oversight Resource.  Any request from a governmental or regulatory agency for information about the Company, its actions, customers, vendors, suppliers or other Company Contacts shall be directed to the Company Agent's Immediate Supervisor or Oversight Resource and any verbal or written response to any governmental or regulatory agency must be accurate, complete, truthful, and must not omit any information that would, in light of the omission make any other statement inaccurate, untruthful, or misleading, with any such response to be approved in advance (where possible, permitted, and appropriate) by an Oversight Resource.

\*       \*       \*

**Accurate Record-Keeping and Documentation**

The Company must keep and maintain accurate records of its business dealings, transactions, sales, purchasing, and financial information ("Company Business Records").  Complete and accurate Company Business Records are essential for the Company to meet its tax, accounting, compliance, and disclosure obligations under

Applicable Laws. Accordingly, each Company Agent with responsibility for maintaining, gathering, summarizing, storing, or handling Company Business Records must do so in a complete, accurate, and timely manner to ensure the integrity of such records. For example, no Company Agent should ever under any circumstances, make a false or misleading entry or characterization in any Company Business Record. Company transactions must be recorded accurately, completely and in a timely manner. Company Personnel must never make false or artificial entries in the Company's Business Records or understate or overstate reports of sales or expenses or alter any documents used to support those records. All Company Personnel who create, collect, or manage Company Confidential Information and Company Business Records of a financial nature must comply with generally accepted accounting principles and established internal control procedures at all times.

## INTRUSION'S AUDIT COMMITTEE CHARTER

38.     Intrusion's Audit Committee Charter states that its purpose is to assist and direct

the Committee in performing the following responsibilities:

- Oversee (or assist the Board in overseeing), as appropriate, the integrity of the Company's financial statements and the Company's compliance with legal and regulatory requirements;

- Monitor the Company's financial reporting processes and its internal audit function regarding finance and accounting;

- Select, appoint, compensate, oversee, evaluate (including the qualifications and independence of) and, where appropriate, replace the registered public accounting firm employed by the Company as its independent auditors to prepare or issue an audit report or related work and to cause such independent auditors to report directly to the Committee;

- Provide a forum for communication among the Board, the independent auditors, and financial and senior management of the Company, including the resolution of disagreements between management and the independent auditors regarding financial reporting and the establishment of procedures to handle complaints regarding accounting, internal audit control and auditing matters;

- Prepare the Committee's report for inclusion in the Company's annual proxy statement; and

- Report the results of its oversight responsibilities to the Company's stockholders.

11

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

39.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

40.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

41.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein were direct, necessary, and substantial participants in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

42.     Each of the Individual Defendants aided, abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with

actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing. Current members of the Board who were appointed after the truth concerning the Company's Shield product was disclosed, rendered substantial assistance to those Individual Defendants who issued, caused to be issued, or acquiesced in the issuance of, the materially false and misleading statements described below by failing to take any corrective actions on behalf of the Company, including but limited to seeking disgorgement of the proceeds of the sales made by Defendants Head and Paxton in the follow-on public offering.

43.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Intrusion and was at all times acting within the course and scope of such agency.

## SUBSTANTIVE ALLEGATIONS

44.     Intrusion develops and sells products to protect against cyberattacks through purported advanced threat intelligence and artificial intelligence.  Intrusion's TraceCop maintains databases of malicious IP and TCP addresses and prevents their access to protected networks. Intrusion Savant is a network data capture and analysis tool that records and reports network activity to product users.

45.     In or about May 2020, Defendants Blount and Head began informing the market that the Company was developing a new product which used artificial intelligence to identify and stop cyberattacks, including "zero day" attacks that exploit both known and unknown computer software vulnerabilities, in real time and without the need for human intervention.  According to these Defendants, this new product would be fully compatible with existing security measures and

require minimal adjustments for use on existing networks. Not surprisingly, this new product generated significant market interest and the Company's stock price increased as a result.

46.     On a May 27, 2020 update following after Intrusion's annual meeting, Defendant Head introduced Defendant Blount as the Company's new president and CEO, and informed investors that the development of Intrusion's new security product was making good progress and was close to public announcement. Defendant Blount described the new product as leveraging Intrusion's TraceCop database and its Savant product, which does real-time analysis, and combining them with artificial intelligence capabilities.

47.     In August 2020, the Company filed a Registration Statement with the SEC on Form S-1 for a follow-on public offering of up to 10 million new shares of Company stock. The Registration Statement included a description of the Company's developmental product, the Intrusion Shield:

> We are in the process of developing a new product offering, Intrusion Shield, that is designed to be a next generation intrusion detection and protection solution. After 20 years of providing research, analysis, and tools to the federal government and enterprise corporations, Intrusion possesses a comprehensive and proprietary threat enriched big data Cloud of Internet activity, including information about the activities of malicious online actors. Intrusion's Shield product will combine that comprehensive, proprietary database with artificial intelligence (AI) and real-time process flow technology to provide businesses and government agencies with a unique and affordable tool to detect, identify, and prevent cyber-crimes.

> *     *     *

> Shield has experienced positive progress during Alpha testing and we have identified twelve companies for the Beta release anticipated to begin in September. The configuration of hardware is a single Dell network appliance installed inline inside of the customer's firewall. The size of the network appliance will vary depending on the number of seats and the size of the customer's internet connection be that 1Gb, 10Gb or 100 Gb.

48.     On October 5, 2020, the Company posted a video of the unboxing of an Intrusion Shield hardware bridge on its YouTube public profile. As part of the presentation, Defendant Head demonstrated a browser-based interface of a world map with a purported "master list" of approximately 4 billion good and bad domain and host names, and a master list of all worldwide IP addresses, both good and bad. Head stated that Intrusion had a "bunch of AI" that added behavioral analytics to those master lists. Despite Head's reference to the AI in Shield, the product provided no AI analytics. Indeed, Shield could not be used in a commercial setting because it was programmed to block network traffic that could not be cleared and would often result in complete network shutdown unless used in simple "observation" mode.

49.     On October 5, 2020, the Company filed an Amended Registration Statement on Form S/1A that disclosed that Defendants Head and Paxton were participating selling shareholders, selling 100,000 and 324,432 shares, respectively. Members of Paxton's family were selling an aggregate 675,558 shares.

50.     The Amended Registration Statement also represented that:

Shield has received very positive feedback from Beta customers who have been surprised and pleased with the ease of installation due to the plug-n-play architecture. Within the first three days of Beta testing, Shield identified and immediately shut down a total of 461,562 threats to three companies, defending them against possible cyber-attacks. Customers went on to say, "It was amazing how many potential threats were blocked in such a short period of time with the Shield solution. We didn't realize how many connections were being attempted each day," said the CEO of a defense company that is participating in the Beta testing. A VP of IT at a large manufacturing company commented, "It was easy to install Shield and because of the blocking we have seen we have already installed a second Shield at a subsidiary company and we anticipate purchasing Shield when it is shipping for several of our companies."

51.     The foregoing statement in the Amended Registration Statement was materially false and misleading because the referenced Shield Beta test was not conducted on companies utilizing open networks. In other words, the Beta test was "rigged" to achieve a positive outcome.

15

The results purportedly achieved in that Beta test were not duplicable in, or indicative of, real world usage.

52.    The Company announced that the follow-on public offering was completed on October 15, 2020 at $8.00 per share.

53.    On October 14, 2020. Intrusion issued a press release announcing that it was taking pre-orders for Shield. The press release stated that the Company had obtained "positive results seen in the preliminary stages of Beta testing, where Shield was able to stop more than 400,000 threats to three companies in just the first three days of testing" due to its use of real-time AI analysis. The Company represented that Shield instantly stopped traffic to and from any malicious sources, preventing exposure to ransomware, viruses, malware, data theft and more.

54.    Intrusion's representations were materially false and misleading. The Shield system was, essentially a packet-filter firewall with a browser-based user interface. The purported positive test results, stopping more than 400,000 cyber threats in the first three days, were achieved only through the use of a fake test bed. In fact, Shield could only operate in "observation" mode, enabling it to flag, but not stop suspicious data packets. Shield's much touted AI capabilities did not exist and the product was incapable of learning the behavior and patterns of cybercrime activity and stop malicious traffic. Shield's functionality was, therefore, limited to simple monitoring.

55.    In an October 16, 2020, video posted to YouTube through BusinessWire, Defendant Head described Shield as a revolutionary product that stopped cyberattacks without user intervention.  Defendant Blount claimed that Shield's AI, in conjunction with the TraceCop database, was able to identify and stop malware through machine learning. Blount also described the Shield as more than mere monitoring software, stating that it stopped cyberattacks in real-time.

56.     The foregoing statements by Defendants Head and Blount were materially false and misleading because they knew that Shield lacked these artificial intelligence capabilities and it was not capable of learning, identifying, or generating new rules to stop novel threats in "real-time."

57.     On January 13, 2021, the Company issued a press release entitled "INTRUSION Successfully Completes Beta Testing of its Newest Cybersecurity Solution, Shield; Announces General Availability." It stated, in relevant part:

> Beta testing of INTRUSION Shield confirmed the solution's efficacy by stopping a total of 77,539,801 cyberthreats from 805,110 uniquely malicious entities attempting to breach 13 companies that participated in the 90-day beta program. Shield was able to continuously protect these companies from ransomware, denial of service attacks, malware, data theft, phishing and more. In fact, analysis by INTRUSION also concluded that Shield would have defended against the Sunburst malware that was at the heart of the recent cyberattacks involving SolarWinds and FireEye, which impacted many government agencies and 18,000 SolarWinds customers.

> "With the high-risk patterns we've incorporated into the rule set that feeds our AI, along with the reputation and suspicious activity that it searches for while monitoring all traffic in and out of a network, we can confidently say Shield would have protected our customers where clearly other security approaches failed," said Jack B. Blount, President and CEO of INTRUSION. "The malware had been living on the SolarWinds network for at least nine months undetected – it got past firewalls and many other cybersecurity products. This is all the more reason companies need a multi-layered approach to cybersecurity, and specifically one that stops threats in real-time to protect them from the damage cybercriminals can cause over time."

> All companies participating in the beta program have made the decision to move forward with Shield in production.

> "The Shield solution has shown us that virtually every network is already infected, and front-end protection is not possible. The understanding that networks are already compromised and that the only means of protection is to monitor and restrict outgoing traffic is the breakthrough of the Shield philosophy," said Richard, President of NovaTech.

> Additionally, false positive security alerts – where legitimate traffic is identified as a threat – are a significant problem among cybersecurity solutions available today, with Ponemon Institute reporting that most cybersecurity companies see mistaken alerts happening 33% of the time. Cybersecurity professionals spend hundreds of

hours investigating these alerts only to determine ultimately that there was no threat. Beta testing for Shield showed a median false positive rate of 0.001% of all traffic, far surpassing other solutions on the market and allowing businesses to run uninterrupted. Multiple beta customers were happy to report they saw zero false positives using Shield.

58.     The claim that Shield stopped 77,539,801 cyberthreats from 805,110 uniquely malicious entities in testing was materially false and misleading. The Securities Complaint cites former employee witnesses who stated that the numbers reported in the press release were fabricated by the Company's marketing team and had no factual basis. (Securities Complaint, ¶ 61).

59.     Also on January 13, 2021, Defendants Byrd and Blount hosted Intrusion's virtual January 2021 Investor Presentation slideshow. Slides touting the purported positive results of Shield's Beta testing were shown in that presentation, during which the Company stated that Shield identified and killed malicious traffic in real-time. Defendants Byrd and Blount represented that Shield was "plug-n-play" compatible with existing firewalls and network security architecture.

60.     The foregoing statements by Defendants Byrd and Blount were materially false and misleading because the positive test results were falsified, Shield did not perform real-time analysis, and Shield was not compatible with existing firewalls and network security architecture. Therefore, Shield was not plug-and-play.

61.     The January 2021 Investor Presentation also included testimonials from three "beta customers," B. Riley Financial, NovaTech, and Bard Associates. The Company failed to disclose, however, that the testimonials were from related parties. B. Riley Financial was Intrusion's

investment banker who organized its follow-on public offering in October 2020; that Bard Associates was a current Intrusion shareholder; and Intrusion's then-Director of Security Solutions, was a former IT Director of NovaTech, who then-served as a consultant for NovaTech.

62.     On February 25, 2021, Intrusion announced its fourth quarter and full year financial results in a press release that, in pertinent part, stated:

> "Since releasing INTRUSION's revolutionary Shield solution only 6 weeks ago, we have received an unprecedented amount of interest and a growing pipeline of customers that is nothing short of extraordinary," said Jack B. Blount, President and CEO of INTRUSION. "Shield is the first platform that uses real-time artificial intelligence to not just block intruders, but to kill cyberattacks including zero-days"

63.     The foregoing statements were materially false and misleading because Shield did not use "real-time artificial intelligence" and it could not "kill cyberattacks including zero-days." The Securities Complaint quotes a former Intrusion cyber security analyst who worked on Shield as stating that "the claim that the Company's technology prevents zero-day attacks is not based on reality." The witness further stated that that the claim was based upon a single incident in which traffic related to an attack was flagged because a line of malicious code happened to have been re-used from another earlier attack and that the attack was identified by pure "luck," and not due to any AI capabilities of Shield. (Securities Complaint, ¶ 66).

64.     Intrusion hosted its fourth quarter fiscal 2020 earnings call on February 28, 2021. During the call, Defendant Blount claimed that 90% of the Shield Beta test customers had subscribed for the Company's Shield service.

65.     The foregoing statement by Defendant Blount was materially false and misleading because none of the Beta test customers subscribed to the Shield service. The Beta test customers were parties related to Intrusion, its officers, or its directors, and/or were existing customers who utilized other Intrusion products and services. Defendant Blount's claim was made in response to a question from analyst Zachary Cummins of B. Riley Securities, Inc., which was one of three preliminary beta test participants whose positive comments were touted in the Company's January 2021 Investor Relations presentation. B. Riley Financial was also Intrusion's principal investment bank, which advised the Company regarding its security offerings.

66.     On March 9, 2021, Intrusion filed its annual report for the period ended December 31, 2020 with the SEC on Form 10-K (the "2020 10-K"). In the 2020 10-K, the Company stated:

> INTRUSION Shield, our cornerstone cybersecurity solution is a comprehensive, real-time AI-based Security-as-a-Service that inspects and kills all dangerous network connections before they can do damage. What makes our approach unique is that it inspects every packet of inbound and outbound traffic and analyzes the reputation of the IP addresses (source and destination), the domain and ports it is communicating on, along with many other fields in the packet to neutralize malicious connections.
>
> Most breaches today are caused by malware free compromises that trigger no alarms in a firewall or endpoint solution. The common denominator is network , which Shield monitors and analyses, allowing Shield to identify and stop all attacks, even malware-free attacks. Shield's capabilities continuously evolve based on constant machine learning and neural networking technology. Unlike traditional industry approaches that rely heavily on human mitigation and defensive approaches, which malicious actors and nation states have learned to bypass. Shield's proprietary architecture isolates and neutralizes malicious traffic and network flows that existing solutions cannot identify before they harm a corporation or government organization. Shield is designed as a next generation Network Detection and Response solution.

After 30 years of providing research, analysis, tools and services to the federal government and enterprise corporations, Intrusion possesses a comprehensive and proprietary data set of petabytes of Internet traffic, including information about the activities of malicious online actors. Shield integrates this rich TraceCop data set with artificial intelligence (AI) and Savant real-time process flow technology to provide our customers with a unique and affordable tool to detect, identify, and neutralize cyberattacks. In particular, the Shield AI has been specifically trained to identify and stop Zero-Day attacks and ransomware, the most prolific and crippling forms of malware today.

67.     The foregoing statements were materially false and misleading because Shield was not able to "inspect[] and kill[] all dangerous network connections before they do damage", did not offer "constant machine learning and neural networking technology", and had not been and could not be "specifically trained to identify and stop Zero-Day attacks and ransomware" because it lacked the necessary AI capabilities.

68.     On March 31, 2021, Intrusion issued a press release announcing that it had "signed a new agreement which leading global consumer products company, Kimberly-Clark, to protect its network using Intrusion Shield." The press release quoted JR Schroeder, Cyber Defense Officer of Kimberly-Clark, as stating "[w]e chose Shield because we needed a solution that could simply and quickly protect our enterprise infrastructure as we continued to scale our business. Shield's ability to plug directly into our network and quickly add value without raising countless alerts will have a huge impact." Defendant Blount was quoted as stating: "Kimberly-Clark is a great example of how multi-national corporations require a new way to protect their critical information. By integrating our best-in-class solution into their network in a matter of minutes, we provide Kimberly-Clark with a simpler, optimal means to automate network security at scale and afford them a level of protection that safeguards them against constantly evolving threats. We couldn't be more excited about having Kimberly-Clark as a Shield customer."

69.     The foregoing statements were materially false and misleading because Kimberly-Clark had not contracted to adopt and pay for Shield, but rather Defendants Blount and Head had negotiated a personal contact at Kimberly-Clark to permit them to represent that they had signed Kimberly-Clark as a Shield customer. While Kimberly-Clark was a customer of pre-existing Intrusion products and services, it never agreed to pay, or paid, to subscribe to Shield. In fact, Kimberly-Clark's existing network security was incompatible with Shield. Moreover, the Company fraudulently attributed revenues from Kimberly-Clark for other products and services as revenue derived from sales of Shield.

70.     On April 6, 2021, the Company issued a press release that, in pertinent part stated:

> INTRUSION, Inc. (NASDAQ: INTZ), a leading provider of cyber-attack prevention solutions including Zero-Days, announced today that global components manufacturing giant Lippert Components (Lippert) has signed an agreement to protect its network using INTRUSION Shield. … They chose Shield for several reasons, including its use of real-time Artificial Intelligence (AI) to stop cyberattacks with 99.999 percent efficiency. In addition to using Shield to protect its own networks, Lippert will work with its supply chain to embrace Shield to ensure high availability of critical components as they continue to scale its global operations.

The press release also quoted Jamie A. Schnur, Group President-Aftermarket at Lippert, as saying: "[w]e chose Shield because we needed a solution that leveraged AI to stop increasingly sophisticated cyberattacks targeting our company. We were impressed with Shield's use of rich historical threat intelligence to make decisions in real-time to determine if traffic going into and out of our network was good or bad and take immediate action."

71.     The foregoing statements were materially false and misleading because Lippert had not contracted to purchase Shield, but instead subscribed to the Company's pre-existing services. In addition, Defendant Gero, a Company director with close ties to Defendant Head, was also a long-serving director and former Chairman of Lippert and its corporate parent, LCI Industries.

Gero negotiated an agreement with Lippert to allow the Company to claim that Lippert had contracted for Shield when, in fact, Lippert did not pay for, or subscribe to, any Shield services.

72.     In an April 13, 2021 press release entitled "Intrusion Q1 2021 Results Surpass Expectations," the Company reported that Shield was being used for more than 50,000 seats, approximately 8 times Intrusion's initial first quarter goal, and that the Company signed new channel partners, including resellers in Australia and Mexico, enabling the global sales of Shield. The Company also stated that "[s]ince announcing the general availability of Shield in January 2021, the company wasted no time ramping up its go-to-market activities to finish the first quarter with several key wins. INTRUSION recently announced manufacturing giants Kimberly-Clark and Lippert Components signing on as Shield customers, with other customer additions including KBI and Geocent adopting Shield to protect their networks."

73.     The foregoing statements were materially false and misleading because the 50,000 seats was an estimate based on the global adoption of Shield by Kimberly-Clark and Lippert, who had not contracted to use Shield. Because the Company had informed investors that service charges per seat for Shield was $20-$40 per month, the 50,000 seat estimate implied annual subscription revenues of $12-$24 million per year compared to Intrusion's 2020 total revenues of $6.6 million.

**The White Diamond Report**

74.     On April 14, 2021, White Diamond issued a report about Intrusion contradicting the public representations made by the Company regarding Shield. White Diamond reported that the Company had no patents for its Shield product, no certifications, and no insurance, which it noted were essential for the sale of cybersecurity products. The report also stated that Shield simply repackaged existing technology and was not an "innovative offering." White Diamond also cast

doubt on the Beta test results announced by Intrusion, noting that the three companies publicized in the Beta testing have existing relationships with Intrusion.

75.     In addition, while noting that it seemed unlikely that Kimberly-Clark would migrate its network to a cybersecurity software that lacked any 3rd party certifications, and that Defendant Gero sat on the boards of both Lippert and Intrusion, White Diamond stated that it was doubtful that the Company's purported sales agreements with Kimberly-Clark and Lippert would result in any significant revenue.

76.     On April 14, 2021, the Company issued a press release stating that Intrusion intended to respond full to the claims in the White Diamond report.  Defendant Blount attributed the report to a sort-selling agenda.

77.     The price of the Company's stock dropped more than 16% following the White Diamond report on April 14, 2021, closing at $23.75 per share on unusually heavy trading volume. The decline in the stock price further dropped 14%, or $3.22 per share by April 15, 2021.

**Intrusion Responds to the White Diamond Report**

78.     On April 22, 2021, the Company issued a press release purporting to rebut the claims made in the White Diamond Report. The Company claimed that Shield was protected by two patents on existing technology and that Intrusion had applied for additional patents in August 2020.  The Company distinguished Shield from its TraceCop product, stating that Shield leverages the TraceCop database to train Shield's AI engine. Repeating the claims about the contracts with Kimberly-Clark and Lippert, the Company claimed that Shield received the required certifications in every jurisdiction in which it was sold.  Intrusion also claimed that Shield is categorized as a Network Defense and Response product designed to kill malicious connections instead of merely creating alerts.

79.     The foregoing statements were materially false and misleading, According to a former employee cited in the Securities Complaint, the artificial intelligence in Shield was "completely flawed in every respect," and the Company spent very little in research and development costs on Shield.   (Securities Complaint, ¶ 83).   According to the Securities Complaint, other former employees of the Company stated that Shield did not provide an AI that was capable of being trained, but rather functioned as a simple packet-filter firewall that checked data packets to existing database of safe and malicious traffic to shutdown any open network in a fail closed system.  (*Id.*).   Also, Shield was not a Network Defense and Response product, but was designed so that it could operate on an open network in observation mode to provide alerts and not kill malicious traffic.   In addition, according to the Securities Complaint, former Company employees stated that Intrusion lacked the certifications to sell products to government agencies, and that Shield was internationally marketed in violation of export restrictions relating to prior Department of Defense contracts. (*Id.*).

## **Subsequent Events**

80.     In an earnings call regarding the Company's first quarter 2021 financial results conducted on May 4, 2021, the Company continued to tout its Shield product, claiming that increased operating expenses were attributable to an increase in employee headcount necessary for the Shield rollout. Defendant Blount claimed the Company had seen an unprecedented interest in in Shield, including the contracts with Kimberly-Clark and Lippert. While admitting that the majority of revenues were from Intrusion's pre-existing products, Blount explained that the 50,000 seats under contract for Shield only pay revenue on a quarterly basis so that Shield revenues would increase as its implementation increased across the market.

81.     The foregoing statements were materially false and misleading because Kimberly-Clark and Lippert did not commit to 50,000 seats for Shield and, therefore, Shield revenues would not increase due to increased implementation across the market.  In addition, Defendants knew that because of the lack of significant contracts for the sale of Shield, the increased employee headcount would be reversed and reductions in Intrusion's workforce would be necessary.

82.     In a July 20, 2021 press release, Intrusion announced preliminary revenues for the second quarter, as well as certain strategic actions and organizational changes. The Company claimed that global interest and recognition of its Shield product, but it stated that longer than anticipated customer evaluations had resulted in lower Shield sales.  Intrusion further announced that Defendant Blount had left the Company and no further affiliation with Intrusion.

83.     The price of Intrusion's common stock dropped almost 50%, to close at $4.26 per share on July 20, 2021 on unusually heavy trading volume. The price of the Company's stock declined an additional 19% following the filing of Intrusion's Form 8-K on July 23, 2021, which stated that Intrusion had "terminated" the services of Defendant Blount as President and CEO.

84.     In an August 12, 2021 earnings call, which included Defendant LeVecchio, the Company's new Chairman of the Board and interim "Principal Executive Officer," and Defendants Head, Byrd, And Davis, Defendant Head stated that Shield had no adverse issues and that sales were impacted by ramp up of the product.  Defendant Head declined to comment about the proportion of revenues attributable to Shield subscriptions or the 50,000 seat backlog that was pending implementation.

85.     Defendant Head's statements were materially false and misleading because Shield did have adverse issues in that it could not perform in the way as described by the Company due to the limitations of the product's AI.  Likewise, the purported 50,000 seats for Shield were not

pending implementation because neither Kimberly-Clark, nor Lippert had actually contracted to use the Shield product.

86.     On August 26, 2021, the Company filed a Form 8-K with the SEC disclosing that it had received notice from the SEC Division of Enforcement that it had initiated an investigation of Intrusion on August 8, 2021.  Disclosure of that investigation caused the price of the Company's stock to drop $0.41 per share, or approximately 8.6%.

**The Falsified Test Results, Falsified Sales
and Inventory, and Concealed Technical Problems**

87.     The Securities Complaint cites numerous accounts by former Intrusion employees of the falsification of test data, fabricated sales and inventory, and the concealment of Shield's numerous technical problems.

88.     For example, according to the Securities Complaint, a former Company employee who previously worked on Shield stated that the assertion that Shield could prevent zero-day attacks was "'not based in reality.'" Instead, the Company's claim was based on a single incident in which Shield identified a line of malicious code that, be mere happenstance, was previously used in a different attack.  Intrusion's software never had the capacity to identify and prevent zero-day attacks. (Securities Complaint, ¶ 98).

89.     Likewise, another former employee stated that the claim that Shield had stopped 77,539,801 cyberthreats was not incorrect and that the number was simply "'made up by the marketing team" at the Company.  (Securities Complaint, ¶ 99).

90.     Defendant Head, who had primary responsibility for programming and testing Shield, mislead investors regarding the progress on the product, as well as the testing process used for Shield.  Head knew that while Shield was being Beta tested, the Company was attempting to remediate hundreds of software issues.  Moreover, at Defendant Head's direction, the Company's

Customer Service ignored warnings and alarms from customers experiencing problems with Shield by turning off alerts and failing to address reported issues.  (Securities Complaint, ¶¶ 100, 101).

91.     To foster interest in Shield, Defendant Head and other Company insiders diverted revenues from contracts on pre-existing products to Shield to give the appearance of increasing Shield sales.  These insiders also documented false inventory levels and shipments for Shield, while suppressing evidence and customer reports of problems with the product. These individuals also retaliated against Company whistleblowers by firing them.  (Securities Complaint, ¶ 103).

92.     Defendant Blount and others also falsified the nature of the relationships with Kimberly-Clark and Lippert, and attributed revenues from contracts for pre-existing products as revenues from Shield.  (Securities Complaint, ¶ 104).

93.     In addition, Defendant Head attempted to circumvent restrictions on sales of Shield in Mexico (Securities Complaint, ¶ 105), and manipulated inventory levels to create the illusion of Shield shipments to customers, resulting in inventory audit conflicts. (*Id*., ¶ 106).

94.     Former employees reported that in January 2021, Shield was failing and shutting down customer networks. As a result, customers were only using Shield in observation mode. (Securities Complaint, ¶ 108). In June and July 2021, two former employees learned that customers of Shield demanded that the Company come to pick up the product because of its problems, causing Intrusion's management to suggest that the sales team give the product away for free to preserve the illusion that it was working.  (*Id.*, ¶ 109).   In August 2021, Blake Dumas, the Company's VP of Engineering, admitted to two former employees that Shield was causing so may alarms that customer service was shutting off alerts.   Dumas also stated that customer and engineering teams were finding approximately 1,000 bugs a month.  (*Id.*).

95.     One former employee stated that he was fired after informing the Company's executive team that Shield was not ready for general availability release.  Likewise, another former employee stated that he was fired after discussing concerns about Shield with Defendant Davis. (Securities Complaint, ¶ 110). Witnesses also reported that Defendant Blount was fired because he was going to expose Intrusion's fraud regarding Shield.  (*Id*., ¶ 111).  A former senior member of Defendant Blount's staff reported that in May or June 2021, after the publication of the White Diamond report and the filing of the Securities Action, Defendant Blount and his team started to suspect that there was an issue with Defendant Head and his team.  Defendant Blount ultimately learned that the testing for Shield was faulty, that purportedly booked and shipped products were never turned on, and that recorded Shield inventory did not exist.  Accordingly, approximately a week before he was fired, Blount directed the Company's Director of Operations, Denise Beckham, to conduct an internal inventory of Shield equipment.  Beckham reportedly informed Blount that she could not match Head's inventory numbers.  Shortly thereafter, Blount was fired. (*Id*., ¶ 112).

## HARM TO INTRUSION

96.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Intrusion has sustained significant damages, as alleged herein. Defendants have damaged Intrusion by causing the Company to waste corporate assets by: (i) incurring costs and expenses in connection with the SEC investigation, (ii) incurring costs and expenses to defend itself in the Securities Action, and (iii) potentially settling class-wide liability in the Securities Action. In addition, certain of the Individual Defendants (defined below) were unjustly enriched by selling shares of Company stock in a follow-on offering conducted while the price of that stock was artificially inflated by Defendants' materially false and misleading statements. Intrusion has

also sustained reputational harm, which will result in lost business opportunities, as direct result of Defendants' breach of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

97.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

98.     Intrusion is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

99.     Plaintiff is a current shareholder of Intrusion and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

100.     A pre-suit demand on the Board of Intrusion is futile and, therefore, excused. At present, Intrusion's Board consists of Defendants Scott, LeVecchio, Gero, McCallum, Schnur and Wilson. Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

101.     Defendant Gero has close ties with Defendant Head, and negotiated the agreement with Lippert to allow the Company to claim that Lippert had contracted for Shield when, in fact, Lippert did not pay for, or subscribe to, any Shield services.

102.     Defendant Schnur was the President of the Aftermarket and Technology Group of Lippert Components, which falsely claimed to enter into an agreement with Intrusion for Shield subscription services when, in fact, Lippert neither used, nor paid for such products or services from Intrusion.

103.    Defendant LeVecchio participated in the August 12, 2021 earnings call, in which included Defendant Head falsely stated that Shield had no adverse issues, that sales were being impacted by ramp up of the product, and refused to about the proportion of revenues attributable to Shield subscriptions or the 50,000 seat backlog that was pending implementation. Defendant LeVecchio failed to correct the material misstatements by Defendant Head and/or recklessly failed to adequately monitor Intrusion's operations so as to know of the falsity of Defendant Head's misstatements.

104.    Defendant McCallum served on the Board's Audit Committee, becoming its Chair on May 18, 2021. Despite her position on the Audit Committee, McCallum failed to adequately monitor the Company's inventory and sales of Shield, and/or recklessly disregarded that the public statements regarding the sales and inventory levels of Shield during the Relevant period were materially false and misleading.

105.    Accordingly, four of the six current members of the Company's Board were actual participants in, and/or recklessly disregarded, the wrongdoing during the Relevant Period as alleged above. A pre-suit demand on the Board would be futile as a majority of the members of the Board are incapable of making an independent and/or disinterested decision to initiate and vigorously pursue this action.

106.    Defendants Gero, Schnur, LeVecchio and McCallum authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

**COUNT**

**Against Defendants Blount, Paxton, Byrd, Head, Davis, Gero, Levecchio, McCallum, Schnur, And Wilson For Violations of § 10(b) of the Exchange Act and Rule 10b-5**

107.   Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

108.   Defendants Blount, Paxton, Byrd, Head, Davis, Gero, Levecchio, Mccallum, Schnur, and Wilson violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

109.   These Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

110.   Defendants Blount, Paxton, Byrd, Head, Davis, Gero, Levecchio, McCallum, Schnur, and Wilson violated §10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Intrusion common stock.

111.   Defendants Blount, Paxton, Byrd, Head, Davis, Gero, Levecchio, McCallum, Schnur, and Wilson acted with scienter because they (a) knew that the public documents and statements issued or disseminated in the name of Intrusion were materially false and misleading; (b) knew that such statements or documents would be issued or disseminated to the investing

public; and (c) knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

112.     Defendants Blount, Paxton, Byrd, Head, Davis, Gero, Levecchio, McCallum, Schnur, and Wilson, by virtue of their receipt of information reflecting the true facts of Intrusion, their control over, and/or receipt and/or modification of Intrusion's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Intrusion, participated in the fraudulent scheme alleged herein.

113.     As a result of the foregoing, the market price of Intrusion common stock was artificially inflated. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of Intrusion common stock in purchasing Intrusion common stock at prices that were artificially inflated as a result of these false and misleading statements.

114.     As a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the SEC investigation and responding to the SEC subpoena, as well as defending itself in the Securities Action, and reputational harm. In addition, Defendants Blount, Paxton, Byrd, Head, Davis, Gero, Levecchio, McCallum, Schnur, and Wilson have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

## COUNT II

### Against The Individual Defendants For Breach Of Fiduciary Duty

115.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

116.     As alleged in detail herein, each of the Individual Defendants had a duty to ensure that Intrusion disseminated accurate, truthful, and complete information to its shareholders.

117.    The Individual Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Intrusion shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases, conference calls, and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

118.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

<u>**COUNT III**</u>
**Against Defendants Head and Paxton For Unjust Enrichment**

119.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

120.    By their wrongful acts and omissions, Defendants Head and Paxton were unjustly enriched at the expense of and to the detriment of Intrusion.

121.    As alleged above, Defendant Paxton, while in possession of information that the positive statements concerning the test results and performance of the Company's Shield product were materially false and misleading, sold approximately 324,432 shares of Intrusion stock for $8.00 per share in a follow-on offering in October 2020. Members of Paxton's family sold approximately 675,558 shares of Intrusion stock in that follow-on offering.

122.    Defendant Head, while in possession of information that the positive statements concerning the test results and performance of the Company's Shield product were materially false and misleading, sold approximately 100,000 shares of Intrusion stock for $8.00 per share in the Company's October 2020 follow-on offering.

123.    Plaintiff, as a shareholder and representative of Intrusion, seeks restitution from Defendants Paxton and Head, and each of them, and seeks an order of this Court disgorging all

34

profits, benefits, and other compensation obtained by these Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

<u>**COUNT IV**</u>
**Against The Individual Defendants For Waste Of Corporate Assets**

124.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

125.    The wrongful conduct alleged caused the Company to be subject to subpoena and investigation by the SEC.  The Company was also subject to suit and potential class-wide liability in the Securities Action.

126.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying defense costs and expenses in connection with the SEC investigation and in responding to the SEC subpoena; and (b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Action.

127.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

128.    Plaintiff on behalf Intrusion has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.    Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Directing Intrusion to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company

and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding to Intrusion restitution from Defendants Paxton and Head, and each of them, and ordering disgorgement of all proceeds from the sale of their Intrusion stock in the Company's follow-on offering;

D.      Awarding to Intrusion restitution from the Individual Defendants, and each of them, for the costs and expenses the Company incurred in connection with the investigation and subpoena by the SEC, the costs and expenses incurred in connection with the defense of the Securities Action, and any monies ultimately paid to resolve the class claims in the Securities Action.

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable.

Dated: June 3, 2022

**RIGRODSKY LAW, P.A.**

By:  */s/ Seth D. Rigrodsky*
Seth D. Rigrodsky (#3147)
Gina M. Serra (#5387)
Herbert W. Mondros (#3308)
300 Delaware Avenue, Suite 210
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: sdr@rl-legal.com
Email: gms@rl-legal.com
Email: hwm@rl-legal.com

**OF COUNSEL:**

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com

*Attorneys for Plaintiff*