## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| NATHAN PRAWITT, derivatively on behalf of INTRUSION, INC., <br><br> Plaintiff, <br><br> v. <br><br> JACK B. BLOUNT, MICHAEL L. PAXTON, B. FRANKLIN BYRD, P. JOE HEAD, GARY DAVIS, JAMES F. GERO, ANTHONY SCOTT, ANTHONY J. LEVECCHIO, KATRINKA B. MCCALLUM, JAMIE M. SCHNUR, GREORY K. WILSON, <br><br> Defendants, <br><br> and <br><br> INTRUSION, INC., <br><br> Nominal Defendant. | Case No. 1:22-cv-00735-MN |

**PLAINTIFF'S BRIEF IN SUPPORT OF UNOPPOSED MOTION FOR**
**PRELIMINARY APPROVAL OF DERIVATIVE SETTLEMENT**

Dated: October 16, 2023

RIGRODSKY LAW, P.A.
Seth D. Rigrodsky (#3147)
Gina M. Serra (#5387)
Herbert Mondros (#3308)
300 Delaware Avenue. Suite 210
Wilmington. DE 19801
(302) 295-5310
Email: sdr@rl-legal.com
        hwm@rl-legal.com
        gms@rl-legal.com

*Counsel for Plaintiff Nathan Prawitt*

## TABLE OF CONTENTS

I.      INTRODUCTION…………………………………………………………………... 1

II.    FACTUAL BACKGROUND…………………………………………………….. 3

III.   PROCEDURAL BACKGROUND……………………………………………….. 6

IV.   TERMS OF THE SETTLEMENT……………………………………………….. 7

V.    THE SETTLEMENT MERITS PRELIMINARY APPROVAL…………............. 8

        A.  Applicable Legal Standards……………………………………………… 8

        B.  The Settlement Is Within the Range of Possible Final Approval…............ 9

            1.      The Settlement Is the Product of Arm's Length Negotiations and Is Therefore Presumptively Fair and Reasonable………………… 9

            2.      The Settlement Confers Substantial and Material Benefits on Intrusion……………………………………………………………... 11

            3.      The Settlement Appropriately Balances the Significant Risks of Continued Litigation with the Benefits Conferred Upon Intrusion and Its Stockholders…………………………………………………. 13

VI.   THE NOTICE PROCEDURES OUTLINED IN THE STIPULATION ARE REASONABLE……………………………………………………………………... 16

VII.  PROPOSED SCHEDULE…………………………………………………………... 17

VIII. CONCLUSION…………………………………………………………………… 18

## <u>TABLE OF AUTHORITIES</u>

*In re Apollo Grp., Inc. Sec. Litig.,*
No. 04-2147, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008)........................................ 15

*In re Auto. Refinishing Paint Antitrust Litig.,*
MDL Dkt. No. 1426, 2004 U.S. Dist. LEXIS 29163 (E.D. Pa. May 10, 2004) ...................... 10

*Bell Atl. Corp. v. Bolger,*
2 F.3d 1304 (3d Cir. 1993) ................................................................................................. 12

*In re Chickie's & Pete's Wage & Hour Litig.,*
U.S. Dist. LEXIS 30366 (E.D. Pa. Mar. 7, 2014) ..................................................................... 10

*Gates v. Rohm & Haas Co.,*
248 F.R.D. 434 (E.D. Pa. 2008) ........................................................................................ 9

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
55 F.3d 768 (3d Cir. 1995) ............................................................................................... 16

*Girsh v. Jepson,*
521 F.2d 153 (3d Cir. 1975) ............................................................................................. 2

*In re Healthcare Servs. Grp., Inc. Derivative Litig.,*
No. 2:20-cv-03426, 2022 U.S. Dist. LEXIS 134005 (E.D. Pa. July 28, 2022) ................... 8, 11

*In re Inter-Op Hip Prosthesis Liab. Litig.,*
204 F.R.D. 359 (N.D. Ohio 2001) ..................................................................................... 10

*Maher v. Zapata Corp.,*
714 F.2d 436 (5th Cir. 1983) ................................................................................. 12, 14, 15

*Mehling v. New York Life Ins. Co.,*
246 F.R.D. 467 (E.D. Pa. 2007) ....................................................................................... 9, 10

*Mills v. Elec. AutoLite Co.,*
396 U.S. 375, 90 S. Ct. 616, 24 L. Ed. 2d 593 (1970) ............................................... 12

*In re Nat'l Football League Players' Concussion Injury Litig.,*
301 F.R.D. 191 (E.D. Pa. 2014) ........................................................................................ 2, 9

*In re NVIDIA Corp. Derivative Litig.,*
2008 LEXIS 1173512008 (N.D. Cal. Dec. 19, 2008) ............................................... 8

*Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco,*
688 F.2d 615 (9th Cir. 1982) ............................................................................................ 11

i

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,*
  148 F.3d 283 (3d Cir. 1998) ................................................................................... 9, 16

*In re Sch. Asbestos Litig.,*
  921 F.2d 1330 (3d Cir. 1990) ....................................................................................... 16

*Shlensky v. Dorsey,*
  574 F.2d 131 (3d Cir. 1978) ......................................................................................... 11

*Unite Nat. Ret. Fund v. Watts*
  2005 U.S. Dist. LEXIS 26246005 (D.N.J. Oct. 28, 2005) ..................................... 8, 11

*Vinh Du v. Blackford*
  2018 U.S. Dist. LEXIS 167103 (D. Del. 2018) ................................................... 2, 8, 9

*In re Warfarin Sodium Antitrust Litig.,*
  391 F.3d 516 (3d Cir. 2004) ......................................................................................... 16

*In re Wilmington Tr. Sec. Litig.,*
  No. 10-cv-0990, 2018 U.S. Dist. LEXIS 114132 ......................................................... 9

## STATUES, RULES & OTHER AUTHORITIES

7 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 22.110 (4th ed. 2022) ............... 8

Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*:
Civil 3D §1839 (2007) ................................................................................................ 8

Fed. R. Civ. P. 23.1 ................................................................................................ 1, 8

*Manual for Complex Litig.* (Fourth) §21.632 (2004) ................................................. 8

Pursuant to Rule 23.1(c) of the Federal Rules of Civil Procedure, Plaintiff Nathan Prawitt ("Plaintiff"), on behalf of Intrusion, Inc. ("Intrusion" or the "Company"), respectfully submits this Brief in Support of Plaintiff's Unopposed Motion for Preliminary Approval of Derivative Settlement.  The terms of the Settlement are set forth in the Stipulation of Compromise and Settlement dated September 28, 2023 (the "Stipulation").[1]  Plaintiff respectfully submits that that this Court should enter an order, substantially in the form attached to the Stipulation as Exhibit A, providing for, among other things: (i) preliminary approval of the Settlement[2] as set forth in the Stipulation; (ii) approval of the form and manner of the Notice of the Settlement; and (iii) setting a date for the Settlement Hearing for the purpose of determining whether the Settlement should be finally approved as fair, reasonable, and adequate.

## I.      INTRODUCTION

The proposed Settlement resolves claims for violations of the Securities Exchange Act of 1934 (the "Exchange Act"), breach of fiduciary duty and related claims predicated on allegations that the Individual Defendants (defined below): (a) issued and/or permitted the issuance of materially false and misleading statements to the public regarding concerning the design and capabilities of the Intrusion Shield product ("Shield") during the period October 14, 2020 and August 26, 2021 (the "Relevant Period"). Specifically, the Individual Defendants allegedly misrepresented the parameters and purported success of product testing, and the number and identity of customers who purportedly purchased Shield; (b) failed to maintain adequate internal controls; (c) wasted corporate assets; and (d) unjustly enriched themselves to the detriment of

---

[1]      *See* Declaration of Timothy J. MacFall, dated October 16, 2023 ("MacFall Decl."), Exhibit 1.

[2]      Unless noted otherwise, all capitalized terms used herein shall have the same meaning as set forth in the Stipulation.

Intrusion.  The Settlement commits Intrusion's Board of Directors (the "Board") to adopt, implement, and maintain a comprehensive package of corporate governance and oversight reforms at Intrusion (the "Measures") for three (3) years, which will significantly enhance long-term shareholder value and protect Intrusion and its shareholders from recurrence of the wrongdoing alleged in this action (the "Action").  Significantly, Intrusion has expressly acknowledged and agreed that the Measures confer substantial benefits upon Intrusion and Intrusion's current stockholders.

In determining whether preliminary approval of the Parties' proposed Settlement is warranted, the court is required to determine only whether "'the proposed settlement discloses grounds to doubt its fairness or other obvious deficiencies such as unduly preferential treatment of class representatives or segments of the class, or excessive compensation of attorney, and whether it appears to fall within the range of possible approval.'" *Vinh Du v. Blackford*, No. 17-cv-194, 2018 U.S. Dist. LEXIS 167103, at *13 (D. Del. 2018) (quoting *In re Nat'l Football League Players' Concussion Injury Litig.*, 301 F.R.D. 191, 198 (E.D. Pa. 2014)). Ultimately, "[t]he decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975).

The Settlement is the product of substantial effort, advocacy, and protracted arm's-length negotiations conducted by skilled and experienced counsel for Plaintiff, the Individual

Defendants,[3] and nominal defendant Intrusion.[4]  The Measures provided by the Settlement will significantly improve the Company's internal controls and directly address the alleged deficiencies that caused the alleged wrongdoing.  In recognition of the substantial benefits conferred upon Intrusion and its current shareholders as a result of the initiation, prosecution, and settlement of the Action, the Stipulation further provides that the Company shall pay Plaintiff's Counsel the agreed-to Fee and Expense Award of $250,000, subject to Court approval.  The Parties negotiated this agreed-to Fee and Expense Award only after they reached agreement on the substantive terms of the Settlement. The Parties' recommendation that the Court preliminarily approve the Settlement is based on their joint belief that the Settlement confers substantial benefits upon, and is in the best interests of, Intrusion and its current stockholders, as informed by their respective investigations, rigorous evaluation of the strengths and weaknesses of the claims and defenses, and careful evaluation of the value of the Measures, when weighed against the risks, costs, and delays that would arise from attempting to improve the result through lengthy and costly continued litigation.

For these reasons, Plaintiff respectfully requests that the Court enter an Order, substantially in the form submitted as Exhibit A to the Stipulation, granting preliminary approval of the Settlement, approving the form, content, and dissemination of the Notice, and setting a date for a Settlement Hearing.

---

[3]     The "Individual Defendants" are Jack B. Blount ("Blount"), Michael L. Paxton ("Paxton"), B. Franklin Byrd ("Byrd"), P. Joe Head ("Head"), Gary Davis ("Davis"), James F. Gero ("Gero"), Anthony Scott ("Scott"), Anthony J. Levecchio ("Levecchio"), Katrinka B. McCallum ("McCallum"), Jamie M. Schnur ("Schnur"), and Gregory K. Wilson ("Wilson").

[4]     Intrusion and the Individual Defendants are referred to collectively herein as the "Defendants."

## II.   FACTUAL BACKGROUND

Intrusion, a Delaware corporation headquartered in Plano, Texas, develops and sells products to protect against cyberattacks through purported advanced threat intelligence and artificial intelligence. ¶¶ 12, 44.[5] The Company's "TraceCop" product maintains databases of malicious Internet Protocol and Transmission Control Protocol addresses and prevents their access to protected networks. ¶ 44. Intrusion records and reports network activity to product users through a network data capture and analysis tool named "Savant." *Id.*

In or about May 2020, it was disclosed that the Company was developing a new product which used artificial intelligence ("AI") to identify and stop cyberattacks, including "zero day" attacks that exploit both known and unknown computer software vulnerabilities, in real time and without the need for human intervention. ¶ 45. Purportedly, this new product would be fully compatible with existing security measures and require minimal adjustments for use on existing networks. *Id.* This new product, "Shield," leveraged Intrusion's TraceCop database and its Savant product, which does real-time analysis, and combining them with AI capabilities. ¶ 47. Plaintiff alleged that during the Relevant Period the Individual Defendants made, or permitted the dissemination of, materially false and misleading statements and/or failed to disclose material facts concerning the Company's Shield product, including its design and capabilities, the parameters and purported success of product testing, and the number and identity of customers who purportedly purchased Shield.  ¶¶ 47-50. In fact, Shield was not only non-functional, its implementation adversely affected customers' networks, sometimes shutting them down entirely. ¶ 79.

On October 14, 2020, Intrusion issued a press release announcing that it was taking pre-

---

[5] "¶ __" refers to paragraphs of the Verified Stockholder Derivative Complaint on June 3, 2022 (ECF No. 1).

orders for Shield. ¶ 53. The press release stated that the Company had obtained "positive results seen in the preliminary stages of Beta testing, where Shield was able to stop more than 400,000 threats to three companies in just the first three days of testing" due to its use of real-time AI analysis. The Company represented that Shield instantly stopped traffic to and from any malicious sources, preventing exposure to ransomware, viruses, malware, data theft and more. *Id*.

In an October 16, 2020, video posted to YouTube through *BusinessWire*, Defendant Head described Shield as a revolutionary product that stopped cyberattacks without user intervention. ¶ 56. Defendant Blount claimed that Shield's AI, in conjunction with the TraceCop database, was able to identify and stop malware through machine learning. Blount also described Shield as more than mere monitoring software, stating that it stopped cyberattacks in real-time. ¶ 55.

On January 13, 2021, the Company issued a press release entitled "INTRUSION Successfully Completes Beta Testing of its Newest Cybersecurity Solution, Shield; Announces General Availability." ¶ 57. The press release provided purported data from the Company's beta testing of Shield, including the number and source of supposed threats it stopped. *Id*. The same day, the Company hosted a virtual investor presentation during which Defendants Byrd and Blount again provided data from Shield's beta tests and stated that Shield identified and killed malicious traffic in real-time. ¶ 59. The presentation further represented that Shield was "plug-n-play" compatible with existing firewalls and network security architecture. Throughout the Relevant Period, the Company continued to issue similar statements regarding the effectiveness and capabilities of its Shield product. *Id*.

On February 28, 2021, Intrusion hosted an earnings call with analysts and investors, during which Defendant Blount claimed that 90% of Shield beta test customers had subscribed for the Company's Shield service. ¶ 64. Moreover, throughout the Relevant Period, the Company issued

statements identifying the corporate clients that had purportedly signed agreements with Intrusion to purchase the Shield product, as well as the total number of new subscriptions. ¶¶ 68, 70, 73. In an April 13, 2021 press release, entitled "Intrusion Q1 2021 Results Surpass Expectations," for instance, the Company reported that Shield was being used for more than 50,000 seats, approximately eight times higher than Intrusion's initial first quarter goal. ¶ 72.

Plaintiff alleges, however, that the foregoing statements issued by the Individual Defendants were materially false and misleading because Shield lacked many of the artificial intelligence and compatibility capabilities that the Company touted, and Intrusion failed to disclose that several of the purported new Shield customers were, in fact, subscribed to the Company's pre-existing services and not Shield. ¶ 71. Indeed, on April 14, 2021, research firm White Diamond Research released a report casting doubt on the beta test results and customer agreements announced by Intrusion. ¶¶ 74-75.  On August 26, 2021, the Company filed a current report on Form 8-K with the SEC disclosing that it had received notice that the SEC Division of Enforcement had initiated an investigation into the Company two weeks prior. ¶ 86.

On April 16, 2021, Intrusion investors initiated a securities class action in the United States District Court for the Eastern District of Texas against the Company and Defendants Blount and Byrd, captioned *Celeste v. Intrusion, Inc. et al.*, Civil Action No. 4:21-cv-00307-SDJ (the "Securities Class Action"). ¶ 4. The Securities Class action was predicated on the issuance of materially false and misleading statements in connection with the Shield. On April 13, 2022, the Securities Class Action was stayed to permit the parties to file a motion for preliminary approval of class action settlement. The parties in the Securities Class Action subsequently filed a motion for final approval of class action settlement. On December 16, 2022, the Court entered an order finally approving the settlement of the Securities Class Action whereby Intrusion agreed to pay

$3,250,000 in cash to the class members.

## III.    PROCEDURAL BACKGROUND

On June 3, 2022, Plaintiff filed a Verified Stockholder Derivative Complaint on behalf of Intrusion against the Individual Defendants, asserting claims for breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and for violations of the Exchange Act. On December 20, 2022, Plaintiff and Defendants filed a stipulation to stay the case for sixty days to afford the Parties the opportunity to discuss next steps and submit a proposed schedule for the Court's consideration. The Court entered an order staying the case the same day.

In or about January 2023, counsel for the parties in the Action commenced discussions and negotiations concerning a possible resolution of the Action. MacFall Decl., ¶ 12. Upon expiration of the stay, the Parties requested, and were subsequently granted, extensions of the stay to allow additional time for the Parties to continue discussions concerning the possible resolution of the Action. The Court entered orders continuing the stay on March 8, 2023, May 9, 2023, and June 7, 2023. Following extensive negotiations by and between counsel for Plaintiffs ("Plaintiffs' Counsel") and counsel for the Individual Defendants, the Parties reached an agreement-in-principle to resolve the Action in or about June 2023. MacFall Decl., ¶ 13.

After the Parties reached an agreement-in-principle regarding the substantive terms of the Settlement, the Parties separately negotiated the attorneys' fees and expenses to be paid to Plaintiff's counsel in consideration of the substantial benefits achieved for the Company through their efforts, resulting in the agreed-upon Fee and Expense Award. MacFall Decl., ¶ 15.

As set forth below, the Settlement is fair, reasonable, and adequate, and in the best interests of Intrusion and current Intrusion stockholders.  In addition, the agreed-to Fee and Expense Award is fair and reasonable based on the substantial benefits conferred on Intrusion by the efforts of Plaintiffs' Counsel.

7

## IV.    TERMS OF THE SETTLEMENT

As a result of the initiation, prosecution, and settlement of the Action, Intrusion will adopt, implement, and maintain the Measures for a minimum of three (3) years. As discussed more fully below the Measures directly address the alleged deficiencies in the Board's oversight function and capabilities to prevent recurrence of the wrongdoing at issue in the Action, namely, the issuance of materially false and misleading statements concerning the Company's products and operations, as well as Intrusion's business prospects.

Courts have recognized that corporate governance reforms such as these "'provide valuable benefits to public companies.'"  *In re Healthcare Servs. Grp., Inc. Derivative Litig.*, No. 2:20-cv-03426, 2022 U.S. Dist. LEXIS 134005, at *19 (E.D. Pa. July 28, 2022) (quoting *In re NVIDIA Corp. Derivative Litig.*, No.06-06110, 2008 LEXIS 117351, at *10 (N.D. Cal. Dec. 19, 2008)); *accord Unite Nat. Ret. Fund v. Watts*, No. 04CV3603, 2005 U.S. Dist. LEXIS 26246, at *10 (D.N.J. Oct. 28, 2005) (finding settlement appropriate due to "the great benefit conferred upon [the company] as a result of the new corporate governance principles provided for in the settlement agreement" that "will serve to prevent and protect [the company] from the reoccurrence of certain alleged wrongdoings").

## V.    THE SETTLEMENT MERITS PRELIMINARY APPROVAL

### A.    Applicable Legal Standards

Settlement and dismissal of stockholder derivative claims requires Court approval.  *See* Fed. R. Civ. P. 23.1(c).[6]  The "general practice" in shareholder derivative suits is that the parties

---

[6]     "The role of the court and the criteria considered in evaluating the adequacy and fairness of a derivative settlement are substantially the same as in the class action."  7 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 22.110, at 476 (4th ed. 2002).  Accordingly, in determining the standards applicable to approval of a derivative settlement, "cases involving dismissal or compromise under Rule 23(e) of non-derivative class actions . . . are relevant by

submit the settlement to the Court for its approval together with a request for a hearing on its propriety. *See* Wright, Miller & Kane, *supra*, §1839.  On preliminary approval, the Court "make[s] a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms and must direct the preparation of notice of the … proposed settlement, and date of the fairness hearing." *Manual for Complex Litig.* (Fourth) §21.632 (2004); *see also Blackford,* 2018 U.S. Dist. LEXIS 167103, at *13. A settlement falls within the "range of possible approval," if there is a conceivable basis for presuming that the standard applied for final approval—fairness, adequacy, and reasonableness—will be satisfied. *Id*. at *14; *see also In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 316-17 (3d Cir. 1998). In determining whether preliminary approval is warranted, the Court's "first and primary concern is whether there are any obvious deficiencies that would cast doubt on the proposed settlement's fairness." *Blackford,* 2018 U.S. Dist. LEXIS 167103, at *13; *In re Nat'l Football League*, 301 F.R.D. at 198. The Court is required to determine whether the proposed Settlement "appears to fall within the range of possible approval." *In re Wilmington Tr. Sec. Litig.*, No. 10-cv-0990, 2018 U.S. Dist. LEXIS 114132, at *13 (D. Del. 2018). A settlement falls within the "range of possible approval," if there is a conceivable basis for presuming that the standard applied for final approval - fairness, adequacy, and reasonableness - will be satisfied. *Mehling v. N.Y. Life Ins.*, 246 F.R.D. 467, 472 (E.D. Pa. 2007). Preliminary approval is usually granted unless the settlement is "obviously deficient." *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 438 (E.D. Pa. 2008) (internal citation omitted).

### B.     The Settlement Is Within the Range of Possible Final Approval

The Settlement was reached through adversarial, arm's-length negotiations by experienced counsel and, thus, is presumptively fair and reasonable.  The Settlement falls within the range of

---

analogy." *See* 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*: Civil 3D §1839, at 195 (2007).

reasonableness for purposes of preliminary approval because it provides substantial benefits to Intrusion and its stockholders, particularly when balanced against the risks, expense, and uncertainty of continued litigation.  Accordingly, the Settlement should be preliminarily approved.

### 1.    The Settlement Is the Product of Arm's Length Negotiations and Is Therefore Presumptively Fair and Reasonable

The Settlement is the product of hard-fought adversarial negotiations over several months by well-informed, experienced counsel.[7] MacFall Decl., ¶¶ 12-13. "[W]hen a settlement is the result of extensive negotiations by experienced counsel, the Court should presume it is fair." *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 359, 380 (N.D. Ohio 2001).

The Parties' negotiations began in January 2023 and continued until the Settlement was finally reached in or about June 2023. MacFall Decl., ¶¶ 12-13. Furthermore, the Parties did not begin negotiating the Fee and Expense Award for Plaintiffs' Counsel until after reaching an agreement in principle regarding the material substantive terms of the Settlement, including the Measures. MacFall ¶ 15.  These facts weigh in favor of preliminary approval of the proposed Settlement.  *See, e.g.*, *Mehling*, 246 F.R.D. at 473 (settlement preliminarily approved where the parties engaged in "hard-fought and lengthy negotiation[s]"); *In re Auto. Refinishing Paint Antitrust Litig.*, MDL Dkt. No. 1426,  2004 U.S. Dist. LEXIS 29163, at *6 (E.D. Pa. May 10, 2004) (preliminary approval granted where settlement was reached after extensive arm's length negotiation between very experienced and competent counsel for the settling parties); *In re Chickie's & Pete's Wage & Hour Litig.*, No. 12-6820, 2014 U.S. Dist. LEXIS 30366, at *12 (E.D. Pa. Mar. 7, 2014) (recognizing that the fact that attorneys' fees were not negotiated until after the material terms of the settlement had been agreed upon further demonstrated the fairness of the settlement because "the amount of attorneys' fees could not have affected the amount of [the]

---

[7] *See* MacFall Decl., Exhibit 2 (the Firm Resume of Rigrodsky Law, P.A.).

recovery").

The Parties have each independently considered the Settlement and agree that it is in the best interests of Intrusion and current Intrusion stockholders.  Significant weight should be attributed to the belief of experienced counsel that a settlement is in the best interest of those affected by the Settlement.  *See Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).

<b>2.</b>        <b><u>The Settlement Confers Substantial and Material Benefits on Intrusion</u></b>

The Third Circuit has held that the principal factor in determining the fairness of a derivative settlement is "the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest."  *Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir. 1978). Courts in this Circuit have further acknowledged that corporate governance reforms that "are designed to prevent a reoccurrence of the alleged wrongdoings" provide "immediate and substantial benefits for all parties."  *Unite Nat. Ret. Fund*, U.S. Dist. LEXIS 26246, at *5, *15 (approving derivative corporate governance settlement); *see also Healthcare Servs. Grp.*, 2022 U.S. Dist. LEXIS 134005, at *19-21.

Here, as stated in the Stipulation, Intrusion has acknowledged and agreed that the Action was a precipitating, substantial and material factor in the adoption and implementation of the Measures by Intrusion's Board. The benefits conferred upon Intrusion and its stockholders as a result of the Settlement are both immediate and long-lasting and are specifically designed to protect Intrusion and its reputation for its own benefit and for the benefit of its shareholders.  The Measures will help bring Intrusion's internal procedures into compliance with best practices, provide increased value to the Company, significantly enhance long-term shareholder value, and protect Intrusion and its shareholders from a repeat of the recent damaging events.  Sound and effective corporate governance confers real economic value to publicly traded companies and their

11

shareholders by empowering boards to exercise effective oversight, thereby improving management and producing better operational and risk management decisions, which correlate with higher company profits.

Additionally, improved corporate governance and Board oversight of core operations substantially reduce the risks of costly regulatory and legal exposure and help restore and preserve the Company's credibility with investors.  Courts have long recognized that corporate governance reforms like those provided for in the Settlement here confer a substantial benefit on the corporation.  *See, e.g.*, *Mills v. Elec. AutoLite Co.*, 396 U.S. 375, 395-96, 90 S. Ct. 616, 24 L. Ed. 2d 593 (1970) (corporation receives "substantial benefit" from a derivative suit and such actions involve "corporate therapeutics" and thus furnish a benefit to all shareholders); *Maher v. Zapata Corp.*, 714 F.2d 436, 461 (5th Cir. 1983) ("effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any [potential] judgment"); *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993) (citing Fourth, Fifth, and Sixth Circuit Courts of Appeal precedent that recognize that corporate governance reforms, in general, provide valuable benefits to corporations and their public stockholders).

Here, the Settlement provides for enhancements to the Board's Audit Committee to ensure compliance with all public reporting requirements, as well as all other applicable laws, regulations and rules through, among other things, active monitoring and investigation of potential or reported material violations of public reporting requirements. For example, the Audit Committee, in conjunction with the Company's Disclosure Committee and General Counsel, must review all of Intrusion's filings with the SEC to ensure accurate disclosure of all material information. This will not only ensure that the Company will make necessary corrective disclosures, but it will help deter

the issuance of misleading material information because such Company spokespersons know their statements will be subject to review for accuracy by the Audit Committee. In addition, within six months of approval of the Settlement, the Audit Committee will review its newly implemented control procedures with an independent advisor. Further, enhancements to Intrusion's Disclosure Committee are intended to ensure that the Company's public statements are accurate and complete in all material respects. For example, the Disclosure Committee is required to annually review the nonfinancial metrics disclosed in the Company's SEC filings, such as product seat rollout, for accuracy and completeness. The enhancements to the Audit and Disclosure Committees impose disclosure controls designed to prevent recurrence of the wrongdoing alleged here. Additionally, the Stipulation requires the Board retain an independent consultant to conduct an annual analysis for each of the next two (2) years regarding appropriate steps Intrusion should take to test and then strengthen the internal control function, including, but not limited to, the accuracy of public disclosures. Enhancements to the Board's Compensation Committee require the Compensation Committee, in determining termination benefits or separation pay to executive officers, to consider circumstances surrounding the particular executive officer's departure and the executive's performance as it relates to both legal compliance and compliance with the Company's internal policies and procedures.

Further, the Measures include material changes to the composition of the Board by way of a new corporate Bylaw amendment requiring a Lead Independent Director on Intrusion's Board in circumstances in which the Chief Executive Officer and Chairman of the Board are the same individual, and the addition of one new independent director to the Board within a year of Settlement approval. The Measures also provide for the Company's adoption of a written whistleblower policy that encourages interested parties to report ethical and legal violations.

As Intrusion has acknowledged and agreed, the Measures confer substantial benefits on Intrusion and its stockholders, demonstrating that the Court should preliminarily approve the Settlement.

### 3. The Settlement Appropriately Balances the Significant Risks of Continued Litigation with the Benefits Conferred Upon Intrusion and Its Stockholders

The uncertainties and vagaries of the continued litigation of the Action further demonstrate that the proposed Settlement is within the range of final approval. Although Plaintiff believed and continues to believe that the Action has substantial merit, there exist significant risks in continuing to prosecute the Action. For example, while Intrusion settled the Securities Class Action for a substantial sum, establishing liability was by no means a foregone conclusion in this Action. And even if Plaintiff was to prevail at the pleading stage, which is no small feat in shareholder derivative litigation, especially in cases alleging pre-suit demand excusal such as the Action, continued litigation would involve costly discovery and substantial risks. Given the obstacles and uncertainties inherent in this complex derivative litigation, the Settlement guarantees immediate, substantial, and lasting benefits, and is unquestionably superior to the very real risk that Intrusion might recover nothing after years of costly litigation.

Continued litigation would also be complex, costly, and of substantial duration. Discovery would need to be completed, depositions would need to be taken, experts would need to be designated, and expert discovery would be conducted. Intrusion and the Individual Defendants would invariably submit and file motions for summary judgment, which would have to be briefed and opposed by Plaintiff, as well as argued. Additionally, a trial would have to be held. Even if liability was established, the amount of recoverable damages would still have posed significant issues and would have been subject to further litigation. Thus, the substantial benefits and value conferred on Intrusion, when compared to the significant expense and uncertainty of continued

litigation, support preliminary approval of the Settlement.[8]  *See Maher*, 714 F.2d at 466 (derivative settlement approved where "the parties' conclusion that any possible benefit to [the company] from pursuing the causes of action would be more than offset by the additional cost of litigation was based on an intelligent and prudent evaluation of their case").[9]

It is also clear that even a victory at trial is no guarantee that any favorable judgment would ultimately be sustained on appeal or by the trial court.  For example, in *In re Apollo Grp., Inc. Sec. Litig.*, No. CV 04-2147, 2008 U.S. Dist. LEXIS 61995, at *15-16 (D. Ariz. Aug. 4, 2008), *rev'd and remanded,* No. 08-16971, 2010 U.S. App. LEXIS 14478 (9th Cir. June 23, 2010), the trial court, on a motion for judgment as a matter of law, overturned a jury verdict of $277 million in favor of stockholders based on insufficient evidence presented at trial to establish loss causation. The jury verdict was later reinstated on appeal but only after two more years of litigation and legal expenses for the parties.  *See In re Apollo Grp., Inc. Sec. Litig.*, 2010 U.S. App. LEXIS 14478, at *2.  Add these post-trial and appellate risks to the difficulty and unpredictability of a lengthy and complex trial, and the immediate benefits of the Settlement become clearer and more apparent.

It is for these reasons that courts recognize that derivative litigation is "notoriously unpredictable," and therefore settlements of stockholder derivative actions and other complex

---

[8]    In addition, the Company's financial condition is precarious.  In its most recent quarterly report, filed with the SEC on Form 10-Q, dated August 14, 2023, Intrusion disclosed that it had cash and cash equivalents of $300,000 and a working capital deficit of $13.9 million. Consequently, the Company warned that "[t]hese conditions raise substantial doubt about the ability of the Company to continue as a going concern." *See id.* at https://www.sec.gov/ix?doc=/Archives/edgar/data/736012/000168316823005743/intrusion_i10q -063023.htm#q2_a3, p. 7.

[9]    *Maher* recognized that the avoidance of further litigation expenses "both monetarily in the form of litigation fees and expenses, and non-monetarily in the form of disruption and distraction of management, and threatened impairment of the Corporation's credit and goodwill, are important and valid reasons for seeking a settlement, and may warrant its approval." *Maher*, 714 F.2d at 467.

litigation are "particularly favored" and are not to be lightly rejected by the courts. *See Maher*, 714 F.2d at 455; *see also In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) ("[T]here is an overriding public interest in settling class action litigation, and it should therefore be encouraged."); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."); *In re Sch. Asbestos Litig.*, 921 F.2d 1330, 1333 (3d Cir. 1990) (courts encourage settlement of complex litigation that "otherwise could linger for years"). This factor weighs heavily in favor of preliminary approval of the Settlement.

## VI.   THE NOTICE PROCEDURES OUTLINED IN THE STIPULATION ARE REASONABLE

The purpose of providing stockholders notice of a proposed settlement is to apprise interested parties of "the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation." *In re Prudential Ins. Co. of Am.*, 148 F.3d 283, 327 (3d Cir. 1998). Here, the Parties propose that within ten (10) days after the entry of an order by the Court preliminarily approving the settlement, Intrusion shall: (1) post a copy of the Notice and the Stipulation and exhibits thereto on the investor relations page of the Company's website; (2) file with the SEC the Notice and Stipulation and exhibits thereto as exhibits to an SEC Form 8-K; and (3) publish the Notice in *Investor's Business Daily*.

The Notice (attached as Exhibit C to the Stipulation) adequately informs current Intrusion stockholders of, *inter alia*: (1) the terms of the Settlement; (2) the date, time, and location of the Settlement Hearing; (3) the Parties' principal contentions; (4) the underlying reasons for the Settlement; and (5) the deadline and procedure for objecting to the Settlement and appearing at the Settlement Hearing (while making clear to current Intrusion stockholders that if they fail to comply

16

with the procedures and deadline for filing objections, they will lose any opportunity to object to any aspect of the Settlement).

Plaintiff respectfully submits that the proposed forms of notice fully satisfy due process requirements because they will fairly and reasonably apprise current Intrusion stockholders of the essential terms of the Settlement and afford them an opportunity to present any objections thereto. Accordingly, the Court should approve the Notice and the manner of dissemination the Parties propose.

## VII.    PROPOSED SCHEDULE

For the Court's consideration, Plaintiff offers the following proposed schedule for the necessary events leading up to and including the Settlement Hearing.  If this schedule is not convenient for the Court, Plaintiff respectfully requests that the Court utilize similar time intervals for the events in amending the proposed Preliminary Approval Order.

| EVENT | DEADLINE |
| --- | --- |
| Deadline for: Intrusion to (1) post a copy of the Notice and the Stipulation and exhibits thereto on the investor relations page of the Company's website; (2) publish the Notice in *Investor's Business Daily* or issue a press release with *GlobeNewswire*; and (3) file with the SEC the notice and Stipulation and exhibits thereto as exhibits to an SEC Form 8-K | Not later than ten (10) days following the entry of the Preliminary Approval Order |
| Deadline to file documentation in support of the Settlement with the Court | At least twenty-eight (28) days prior to the Settlement Hearing |
| Deadline to file any objections to the Settlement with the Court | At least twenty-one (21) days prior to the Settlement Hearing |
| Deadline to file reply papers in support of the Settlement, if any, with the Court | At least seven (7) days prior to the Settlement Hearing |
| Settlement Hearing date | Fifty-five (55) days following the entry of the Preliminary Approval Order |

17

## VIII.   CONCLUSION

The Settlement requires Intrusion to adopt, implement, and maintain the Measures, which meaningfully address the issues Plaintiff raised in the Action.  The Settlement is an excellent resolution for Intrusion of litigation of substantial complexity and cost.  Plaintiff respectfully requests that the Court preliminarily approve the Settlement, direct the issuance of the Notice, and schedule the Settlement Hearing to consider final approval of the Settlement.

October 16, 2023                                        Respectfully submitted,

                                        **RIGRODSKY LAW, P.A.**

                                        */s/ Seth D. Rigrodsky*
                                        Seth D. Rigrodsky (#3147)
                                        Gina M. Serra (#5387)
                                        Herbert Mondros (#3308)
                                        300 Delaware Avenue. Suite 210
                                        Wilmington. DE 19801
                                        (302) 295-5310
                                        Email: sdr@rl-legal.com
                                                    hwm@rl-legal.com
                                                    gms@rl-legal.com

                                        *Counsel for Plaintiff Nathan Prawitt*

18